IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LINDQUIST FORD, INC.,
STEVEN LINDQUIST and
CRAIG MILLER,

                                        OPINION and ORDER

                      Plaintiffs,

                                         07-C-0012-C

          v.

MIDDLETON MOTORS, INC.,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil action for monetary relief, plaintiffs Lindquist Ford, Inc., Steven Lindquist and Craig Miller are suing defendant Middleton Motors, Inc. for breach of contract, quantum meruit, unjust enrichment and promissory estoppel. Presently before the court is defendants' motion for summary judgment, in which it contends that there is no breach because the parties did not have a contract and no equitable relief is available because the parties previously agreed to no liability during their ongoing negotiations. Jurisdiction is present under 28 U.S.C. § 1332.

From the evidence adduced, no reasonable jury could find that the parties ever

1

reached an agreement on all terms being negotiated or that defendant ever promised to pay for management services without requiring a cash infusion.  Therefore, I will grant defendant's motion for summary judgment with respect to plaintiffs' breach of contract and promissory estoppel claims.  Because a reasonable jury could find that plaintiffs' management services were valuable to defendant and conferred a benefit upon it, I will deny defendant's motion for summary judgment with respect to plaintiffs' quantum meruit and unjust enrichment claims.

Before I turn to the facts, a word about procedure is in order.  Rather than propose their own findings of fact, plaintiffs stated some facts in their brief and wedged others into their responses to defendant's proposed findings of facts, many to dispute characterizations of facts as opposed to the facts themselves.  This is not an effective way to insure that facts are considered for purposes of summary judgment.  "The court will not consider facts contained only in a brief."  Procedure to Be Followed on Motions for Summary Judgment, I.B.4., attached to Preliminary Pretrial Conference Order (February 8, 2007), dkt. #7.  "All facts necessary to sustain a party's position on a motion for summary judgment must be explicitly proposed as findings of fact."  Helpful Tips for Filing a Summary Judgment Motion in Cases Assigned to Judge Barbara Crabb, attached to Preliminary Pretrial Conference Order on February 8, 2007, dkt. # 7.  When it is necessary for the nonmovant to go beyond disputing the other party's facts, it should propose its own findings of facts.  Procedure, II.B.,

2

dkt. #7. I have considered only those facts in plaintiffs' responses that are responsive to defendants' proposed findings of facts.

From the defendant's proposed findings of facts and plaintiff's responses to these facts I find the following facts to be undisputed.

## UNDISPUTED FACTS

### A.  Parties

Plaintiff Lindquist Ford, Inc. is a Delaware corporation with its principal place of business in Bettendorf, Iowa.  Lindquist Ford is an automobile dealership.

Plaintiffs Steven Lindquist and Craig Miller are domiciled in Scott County, Iowa. Steven Lindquist is an owner of Lindquist Ford and Craig Miller serves as the General Manager of Lindquist Ford.

Defendant Middleton Motors, Inc. is a Wisconsin corporation with its principal place of business in Middleton, Wisconsin.

### B.  The Business Relationship

1.  Confidentiality agreement and initial negotiations for management services

Prior to 2003, Lindquist and Miller became familiar with Middleton Motors through a dealer "20 Group," a regional group of non-competing dealers sponsored by the National

3

Automobile Dealers Association, which meets periodically to exchange information and cooperate to improve the operation and profitability of their respective dealerships.

On March 14, 2003, plaintiffs Lindquist and Miller met with David Hudson, an owner and employee of defendant, at Middleton Motors to discuss the possibility of assisting defendant in the management of its dealership. Plaintiffs Lindquist and Miller entered into a "Confidentiality Agreement" with defendant dated March 25, 2003. At the time, the parties were discussing some kind of "cash infusion" into the dealership. (The parties dispute whether they were considering any actual investment into the business at that time.) Plaintiffs Lindquist and Miller signed the agreement in their individual capacities.

The Confidentiality Agreement includes a "no-liability" provision in paragraph 6:

6.) We acknowledge and agree that unless and until a written definitive agreement concerning the Transaction has been executed neither you, any of your Representatives, us nor any of our Representatives, will have any liability to the other with respect to the Transaction, whether by virtue of this agreement or any other written or oral expression with respect to the Transaction or otherwise.

The agreement defines the "Transaction" as "exploring the possible acquisition . . . of all or a portion of the business" owned by defendant.

On April 17, 2003, plaintiffs Lindquist and Miller and Lindquist Ford's accountant Carl Woodward met with defendant's co-owners Dave and Robert Hudson and defendant's former accountant Joseph Schwarz in Madison, Wisconsin to discuss the parameters of an

4

agreement.  Before the meeting, Dave Hudson had called to set up the meeting to discuss the formation of "some type of management agreement."  At the meeting, the parties discussed compensation that would be paid to plaintiffs Lindquist and Miller if they were to "help" defendant.  The parties also discussed the possibility of plaintiffs' providing a "cash infusion" to defendant, but investment by plaintiffs to become shareholders in the business was not an option at that time.

The parties did not reach an agreement on any terms of a management agreement at this meeting, but did agree that plaintiff Miller would begin working at defendant's dealership on the Monday following the meeting and that a formal agreement would be negotiated later.

## 2.  Ongoing negotiations for investment and management services

From April 17, 2003 until July 23, 2003, the parties engaged in a "running dialog" about the nature and scope of a final agreement.  On approximately June 2, 2003, plaintiff Miller faxed Dave Hudson a document titled "Outline for Management Agreement" proposing a combined "Management Fee" and "Fee" of 60 percent of profits.  On July 1, 2003, Schwarz sent plaintiffs an email attaching two memoranda Schwarz had prepared discussing investment as a shareholder, emphasizing that "investment is necessary," and discussing issues to resolve, including the investment of $500,000 in cash, calculation of

5

profits and income and termination provisions for both sides.  On July 2, 2003, David Hudson, Schwarz and plaintiff Miller met for further discussions. Schwarz prepared a memorandum the same day addressed to Woodward and plaintiffs Miller and Lindquist to summarize the discussion. In the memo, Schwarz sets out three issues that required further negotiation: the definition of income, the issue of a cash infusion and buyout provisions.

On July 23, 2003, a conference took place at Schwarz's office with Schwarz, Robert Hudson and David Hudson attending in person, and Carl Woodward, Craig Miller and Steven Lindquist participating by phone.  (The parties dispute what happened at the conference call.  Defendants contend that the parties did not reach an agreement during the phone conference.  According to plaintiffs, the parties agreed to the following terms during the phone conference: (1) plaintiffs Lindquist and Miller, acting through an LLC, would take over the management of the operations and have full and complete authority in running the day-to-day operations of defendant; (2) plaintiffs Lindquist and Miller would invest a sum of $500,000 in exchange for a 25% ownership interest in defendant and would sign the same buy-sell agreement to which the other shareholders were parties; (3) if Dan Hudson sold his stock back to defendant, it would be held as treasury stock so that plaintiffs Lindquist and Miller would effectively become owners of 33 1/3% of defendant; (4) plaintiffs Lindquist and Miller  would earn fees based on defendant's profitability according to an agreed upon formula; (5) real income would be defined as GAAP income, adjusted for LIFO adjustments

6

and other items that would result in one party's receiving a benefit or detriment that should have followed the other party; and (6) a termination fee would be calculated by alternate specified methods, depending on whether it was defendant or plaintiffs Lindquist and Miller who terminated the management agreement.   Plaintiff Miller stated that the phone conference "was when we finally all of us agreed.  We were via phone, but we all agreed on the phone.  That question was asked, can we all agree, and we all agreed.")

On August 28, 2003, Schwarz completed a document titled "Letter of Understanding."  Schwarz sent the letter to David and Robert Hudson and asked that they review it.  On September 10, 2003, David Hudson met personally with plaintiff Miller and gave him a copy of the letter for review by him, Woodward and plaintiff Lindquist to review.

The first sentence of the letter states: "This is a Letter of Understanding for the relationship among the parties to be legally formalized at a later point."  The letter identifies the parties as defendant and a Management Group consisting of plaintiffs.  Under a section titled "Agreement Provisions," the letter states, in part:

> The above parties have agreed to enter into an agreement whereby the Management Group would provide a cash infusion into Middleton Motors, Inc. and take over management of the operations for the fees discussed below.

The letter of understanding states that plaintiffs Lindquist and Miller, "as individuals" will invest $500,000 into defendant in return for a 25% ownership interest in the dealership; however, the letter does not address the timing of the cash infusion or choose among

7

alternatives discussed previously by the parties.  The letter discusses fees to be paid to the Management Group, quoted as a percentage of "real income" to begin with the first month that defendant "reports a small 'real income' profit to be defined by the accountants representing the two parties."  Moreover, the letter includes termination provisions, proposing that, regardless which party decides to terminate, no management fee would be paid if the dealership did not earn at least $500,000 in income for a twelve-month period.

No plaintiff responded to the letter of understanding or signed it.

Over the fall of 2003 and into early 2004, the Hudsons periodically asked plaintiff Miller when the cash investment would be made.  Plaintiff Miller would respond with statements such as "Do not worry, it is coming," "We are just about there" and  "Just about got it done." Plaintiff Miller gave no reason for the delay.  (Parties dispute whether plaintiffs were "prepared" to invest in the business.  According to plaintiffs, they were, but did not invest because they were waiting to receive the promised stock.)  The parties continued to engage in discussions about a management agreement and whether an investment would include a 25% or 33% interest.

Neither Lindquist nor Miller ever invested any money in the Middleton dealership. At the same time, during the fall of 2003, plaintiff Miller began expanding defendant's inventory by purchasing vehicles on lines of credit guaranteed personally by David and Robert Hudson.  The dealership debt personally guaranteed by the Hudsons doubled during

8

2003, while no additional working capital was contributed by plaintiffs Lindquist or Miller.

3.  Termination

On March 22, 2004, defendant terminated plaintiff Miller's services at defendant's dealership.  The Hudsons had concerns regarding the continued lack of response regarding the investment commitment, their increased personal financial exposure on dealership debts, employee morale issues caused by Miller's management style, slipping customer satisfaction as shown in survey results and excessive cost cutting efforts.

After ending all arrangements with plaintiffs Miller and Lindquist, Robert and David Hudson each invested an additional approximately $100,000 in defendant in return for additional shares of stock.  Michael Bihun, a former employee of Lindquist Ford who was hired by plaintiff Miller to work at defendant, remained with defendant and invested $250,000 in return for stock in defendant.

Defendant was not profitable in 2003, 2004, 2005 or 2006.  (The parties dispute whether certain expenses included in the profit calculations would be excluded from the calculation of any management fee.  However, plaintiffs do not specify whether the profit-based management fee would become a positive number without these expenses.)

Plaintiff Miller reduced the time he spent at defendant's dealership after September 2003. His records show that he was at the dealership for the following number of days in

each month:

| | |
|---|---|
| April 2003: | 4 days |
| May 2003: | 8 days |
| June 2003: | 8 days |
| July 2003: | 6 days |
| August 2003: | 5 days |
| September 2003: | 8 days |
| October 2003: | 6 days |
| November 2003: | 3 days |
| December 2003: | 4 days |
| January 2004: | 2 days |
| February 2004: | 4 days |
| March 2004: | 5 days |

OPINION

A. <u>Choice of Law</u>

The parties do not dispute that Wisconsin law applies to their dispute so I need not

conduct a choice of law analysis. <u>FutureSource LLC v. Reuters Ltd.</u>, 312 F.3d 281, 283 (7th

Cir. 2002); <u>State Farm Mutual Automobile Insurance Co. v. Gillette</u>, 2002 WI 31, ¶ 51, 251

Wis. 2d 561, 641 N.W.2d 662.

B. <u>Breach of Contract</u>

The primary goal of contract construction is to determine and give effect to the

parties' intention at the time the contract was made. <u>Farm Credit Services v. Wysocki</u>, 2001

WI 51, ¶ 12, 243 Wis. 2d 305, 627 N.W.2d 444.  When the terms of the contract are plain and unambiguous, the court must construe the contract according to its plain meaning.  Id. Defendants contend that there was no contract to breach, first because the parties agreed previously to a no-liability provision that required a written, definitive contract to be executed by the parties before they could be contractually liable, and second because the parties never reached a definitive agreement, reaching at most a non-binding "agreement to agree."  Plaintiffs contend that the no-liability provision is not enforceable, and that the parties reached a definitive agreement at the July 23, 2003 conference call as reflected by the subsequent letter of understanding.

1.  Confidentiality agreement

In a confidentiality agreement signed at the beginning of their negotiations in March 2003, plaintiffs agreed that the parties' actions and conduct related to the possible acquisition of all or a portion of Middleton Motors would not give rise to any liability "unless and until a written definitive agreement" had been "executed."  As negotiations progressed, the parties discussed the terms and, according to plaintiffs, reached an oral agreement on July 23, 2003 and "memorialized" it in a Letter of Understanding in August or September 2003.

Defendant contends that the confidentiality agreement shields them from contractual

11

liability because parties never "executed" a "written definitive agreement" after signing the agreement.  However, under Wisconsin law, a contract not within the statute of frauds may be modified orally even though the contract requires modifications to be in writing.  S & M Rotogravure Service, Inc. v. Baer, 77 Wis.2d 454, 469, 252 N.W.2d 913, 920 (1977).

According to defendant, because S & M Rotogravure and several of its progeny involved construction change orders, the principle stated in S & M Rotogravure is irrelevant to the issues in this case.  Not so.  In S & M Rotogravure, the court made a broad statement regarding the law of contracts, stating "[i]t is universally accepted that, unless a contract is one required by law to be in writing, the contract can be modified orally although it provides that it can be modified only in writing."  S & M Rotogravure, 77 Wis.2d at 469, 252 N.W.2d at 920.  Defendant does not attempt to explain why it believes the rule applies to construction change orders but not to other contracts.  Moreover, the Seventh Circuit has cited S & M Rotogravure for the general principle that "[i]n cases not governed by the Uniform Commercial Code, Wisconsin follows the common law rule that allows a contract to be waived orally (unless within the Statute of Frauds) even though the contract provides that it can be modified only in writing."  Wisconsin Knife Works v. National Metal Crafters, 781 F.2d 1280, 1288 (7th Cir. 1986).

I conclude that S & M Rotogravure applies to this case.  If plaintiffs can demonstrate that they intended to be bound to specific contract terms, they will demonstrate

simultaneously that they intended to modify the no-liability provision found in the confidentiality agreement.

2. Agreement to agree

Defendant's next contention is that the parties never intended to be bound to specific terms because they had not yet reached a definitive agreement on all the terms. Although issues of intent are often for a jury, "Wisconsin takes an objective view of intent," and summary judgment is appropriate where the undisputed facts demonstrate the parties' objective intent. Skycom Corp. v. Telstar Corp., 813 F.2d 810, 814-15 (7th Cir. 1987). "The status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves." Id. In determining the parties' intent to contract, the court should turn first to the terms of the purported agreement. Herder Hallmark Consultants, Inc. v. Regnier Consulting Group, Inc., 2004 WI App 134, ¶¶ 8, 10, 275 Wis. 2d 349, 685 N.W.2d 564. If no such intent is discernible from the terms of a contract, the court may turn to extrinsic evidence to determine whether the parties' conduct "evidences sufficient definiteness of an intent to contract." Id., ¶ 10. The court may consider the conduct of the parties, the parties' negotiations and the circumstances surrounding relevant transactions to determine the intent of the parties. Kernz v. J.L. French Corp., 2003 WI App 140, ¶ 10, 266 Wis. 2d 124, 667 N.W.2d 751 (citing Board of Regents

13

of University of Wisconsin System v. Mussallem, 94 Wis. 2d 657, 671, 289 N.W.2d 801 (1980); Smith v. Osborn, 66 Wis. 2d 264, 272, 223 N.W.2d 913 (1974); and Painter v. Estate of Grossman, 250 Wis. 457, 461, 27 N.W.2d 365 (1947)).

a.  Conference call

Plaintiffs contend that on July 23, 2003, the parties reached a binding oral agreement before the letter of understanding was prepared.  According to plaintiffs, the parties agreed at the phone conference to a litany of terms.  However, there is no evidence that the parties agreed to specific terms on the termination provisions, only that the terms would be different for plaintiffs and defendant.  Nor is there evidence that the parties agreed to terms about the timing and order of transferring the money and stock.  (Plaintiff Miller's declaration does state that the parties "agreed to these terms in detail so there was nothing left to negotiate." However, under Rule 56, the non-moving party must come forward with specific facts that would support a jury's verdict in its favor.  Van Diest Supply Co. v. Shelby County State Bank, 425 F.3d 437, 439 (7th Cir. 2005).)  Plaintiffs' claim for breach of contract is tied to defendant's termination of the parties' business relationship.  In order to enforce this "contract," there must be specific termination provisions to enforce.

b.  Letter of understanding

Plaintiffs contend that the letter of understanding demonstrates the parties' intent to contract because it "reflects" the terms agreed upon at the conference call and because it contains specific termination provisions.  However, this argument is a non-starter.  Plaintiffs' bald assertion that the letter "reflects" the terms agreed upon during the conference call does not show that the termination provisions found in the letter were agreed upon during the conference call.  Again, Rule 56 requires the nonmovant to come forward with specific facts.

Moreover, the letter of understanding could not be a binding obligation in and of itself.  Under Wisconsin law, "agreements to agree do not create binding obligations." Skycom Corp. v. Telstar Corp., 813 F.2d 810, 814 (7th Cir. 1987) (citing Witt v. Realist, Inc., 18 Wis. 2d 282, 298, 118 N.W.2d 85, 93-94 (1962); Dunlop v. Laitsch, 16 Wis. 2d 36, 113 N.W.2d 551 (1962)).  The letter states, "This is a letter of Understanding for the relationship among the parties to be legally formalized at a later point," and "the above parties have agreed to enter into an agreement . . . "

Because plaintiffs have not adduced evidence of any specific termination provision agreed upon during the phone conference and because the letter of understanding does not create a binding obligation, a reasonable finder of fact could find only that no contract exists between the parties except the confidentiality agreement.  Accordingly, I will grant defendant's motion for summary judgment on plaintiffs' breach of contract claim.

15

### C.  Equitable Relief

Plaintiffs have asserted three claims arising in equity for their management services: quantum meruit, unjust enrichment and promissory estoppel.  Defendants contend that these claims cannot prevail because plaintiffs have "unclean hands," they are subject to the confidentiality agreement and their services were not valuable.

### 1.  Unclean hands

Defendant seeks to block all of plaintiffs' equitable claims on the basis of the "clean hands" doctrine, under which a plaintiff is not entitled to affirmative equitable relief unless she has "clean hands."  S & M Rotogravure, 77 Wis. 2d at 466, 252 N.W.2d 913, 918-19 (citing Martinson v. Brooks Equipment Leasing, Inc., 36 Wis. 2d 209, 223, 152 N.W.2d 849 (1967)).  However, "before a court may deny a plaintiff relief in equity upon the 'clean hands' doctrine, it must clearly appear that the things from which the plaintiff seeks relief are the fruit of its own wrongful or unlawful course of conduct."  Id. (citing David Adler & Sons Co. v. Maglio, 200 Wis. 153, 160-61, 228 N.W. 123 (1929)).

Defendant attriutes plaintiffs' "unclean hands" to their failure to invest the $500,000 as agreed upon.  Viewed in the light most favorable to plaintiffs, it is not clear that plaintiffs' delay in investment caused defendant's decision to terminate the business relationship.  Defendants were equally guilty of delay.  The facts do not show whether the parties ever

16

agreed upon the order or timing of the transaction.

Even if plaintiffs' delay caused the termination, defendant has not shown that plaintiffs delayed for purposes that could be considered the kind of "injustice or bad faith" required by the "clean hands" doctrine.  Id. at 467 (failure to secure written change order is "not the kind of injustice or bad faith which constitutes unclean hands"); compare Martinson, 36 Wis. 2d at 223 (appellant had unclean hands where he had refused to complete his required performance to force payment to which he was not entitled.)

2.  Promissory estoppel

Defendant may be held liable under the theory of promissory estoppel if it (1) made a promise that induced plaintiffs to take "definite and substantial" action or forbearance that (2) defendant should reasonably have expected and for which (3) injustice can be avoided only by enforcement of the promise.  Kramer v. Alpine Valley Resort, Inc., 108 Wis. 2d 417, 422, 321 N.W.2d 293, 295-96 (1982) (citing Hoffman v. Red Owl Stores, Inc., 26 Wis. 2d 683, 698, 133 N.W.2d 267, 275 (1965)).

Promissory estoppel is not applicable unless there exists a "promise that a reasonable person would expect to be carried out."  Cosgrove v. Bartolotta, 150 F.3d 729, 733 (7th Cir. 1998) (citations omitted).  Investing in a "promise that is vague and hedged about with conditions" "for a chance" does not give rise to a cause of action for promissory estoppel.

17

Id.  Moreover, where a promise has conditions, or "strings attached," a plaintiff may not be entitled to relief under promissory estoppel unless she satisfies the conditions.  Nehm v. State Dept. of Agriculture, Trade and Consumer Protection, 212 Wis. 2d 107, 124, 567 N.W.2d 640, 646-47 (Ct. App. 1997).

Plaintiffs' claim of promissory estoppel is that defendant promised to compensate plaintiffs for management and other services.  However, plaintiffs have failed to adduce any evidence that defendant ever promised to pay for management services without requiring plaintiffs to invest cash as part of the deal.  Even at their early meeting in March or April of 2003, defendant stated a need for a cash infusion.  Moreover, the parties never reached an independent agreement for management services.  Because plaintiffs never invested, they failed to satisfy the conditions of the only promise that might have been established on the evidence adduced.  Therefore, I will grant defendant's motion for summary judgment on plaintiffs' promissory estoppel claim.

3.  Unjust enrichment and quantum meruit

Plaintiff contends that they should be entitled to compensation for the management services they provided defendant under either the theory of quantum meruit or the theory of unjust enrichment.

18

a. Confidentiality agreement

Defendant contends that because the parties had agreed to a no-liability provision in the confidentiality agreement signed at the beginning of negotiations, there can be no relief under quantum meruit or unjust enrichment. However, the no-liability provision addresses only "liability . . . with respect to the Transaction." Transaction is defined in the agreement as "the possible acquisition of all or a portion of the business owned" by defendant.

Defendant contends that the no-liability provision should be interpreted in light of the parties' negotiations, which "intertwined" management services with plaintiffs' acquisition of a part of the business. However, the parties' ongoing negotiations are not relevant to interpreting the scope of the no-liability provision. The language of the agreement is plain and unambiguous, so I will not turn to the parties' ongoing negotiations to determine its scope. Farm Credit Services, 2001 WI 51, ¶ 12.

The parties' agreement to no liability "with respect to" "the possible acquisition of all or a portion of the business" does not shield defendant from liability for conduct only incidentally related to the possible acquisition of the business. Plaintiffs' management services were not a necessary part of acquiring the business regardless whether they were ultimately "intertwined" as part of the total deal between the parties. If defendant wanted to prevent liability for management services pending the business acquisition, it could have easily indicated this in the agreement. It did not.

19

Because the confidentiality agreement does not bar equitable relief for plaintiff's services to defendant, I turn to the merits of each claim.  Under the theory of quantum meruit, a plaintiff may be entitled to "reasonable compensation" for services rendered "based upon an implied contract to pay for those services.  <u>Ramsey v. Ellis</u>, 168 Wis. 2d 779, 785, 484 N.W.2d 331, 333 (1992).  The related theory of unjust enrichment does not require an implied contract, but limits damages to the value of the benefit conferred upon the defendant.  <u>Id.</u>

b.  Quantum meruit

To recover under quantum meruit, plaintiffs must show that (1) defendant requested plaintiffs to perform services; (2) plaintiffs complied with the request; and (3) the services were valuable to defendant.  <u>Theuerkauf v. Sutton</u>, 102 Wis. 2d 176, 185, 306 N.W.2d 651, 658 (1981).  This creates a rebuttable presumption that "the parties mutually intended fair payment."  <u>Id.</u>  The ultimate inquiry is whether the parties came to a mutual agreement by their words, conduct or course of dealing, as shown by parties' external expressions of intention.  <u>Id.</u> at 186.

It is undisputed that defendant requested management services and plaintiffs complied with the request.  Moreover, although defendant contends that they requested services only on the condition of receiving a "cash infusion," this is irrelevant to whether the

20

services were requested.  Defendant's primary contention is that because plaintiffs' compensation for management services was always intended to be limited to a percentage of profits and defendant was not profitable for any of the years plaintiffs managed the business, plaintiffs' management services were not valuable to it.

The problem with defendant's contention is that it conflates the compensation for plaintiffs' services under a binding contract with the actual value of plaintiffs' services to defendant.  It is true that if the parties had a binding contract, plaintiffs' compensation for their management services could be limited to a percentage of profits.  But this does not mean that plaintiffs' services were not valuable to defendant unless it made a profit. Defendant allowed plaintiff Miller to manage the dealership from April 2003 until March 2004 and expand its inventory by purchasing vehicles on lines of credit guaranteed by David and Robert Hudson.  Viewing these facts in the light most favorable to plaintiffs, a reasonable fact finder could conclude that plaintiffs' services were valuable to defendant.

Having met the three prima facie elements for purposes of summary judgment, plaintiffs have established a rebuttable presumption that "the parties mutually intended fair payment."  Defendant may rebut this presumption by showing that it did not agree to pay plaintiffs the "reasonable value" of its services, id., but the undisputed facts do not establish this.  Although the parties sought to reach an agreement that would limit compensation for services to a percentage of profit, and delayed reaching an agreement about management

21

services before plaintiff Miller began managing defendant, there is no evidence that defendant did not agree to pay for any management services if no agreement was ultimately reached on the other terms.  Thus, at this stage, I must presume that defendant agreed to pay plaintiffs the "reasonable value" of their services.  Defendant's motion for summary judgment will be denied on plaintiffs' quantum meruit claim.

c.  Unjust enrichment

To recover under unjust enrichment, plaintiffs must show (1) plaintiffs conferred a benefit upon defendant; (2) defendant knew about or appreciated the benefit; and (3) defendant accepted or retained the benefit under circumstances making it inequitable for defendant to retain the benefit without payment of its value.  Puttkamer v. Minth, 83 Wis. 2d 686, 689, 266 N.W.2d 361, 363 (1978).

The fact that plaintiff Miller was allowed to manage the dealership for nearly a year and take charge of inventory purchases allows the inference that defendants received a "benefit" from plaintiffs' management services regardless of immediate profits.  Defendant does not suggest it did not know about plaintiffs' services.

Thus, the only issue remaining is whether the "circumstances make it inequitable for defendant to retain the benefit without payment."  It is true that the parties were in the process of negotiating an agreement that would involve both management services and cash

22

investment for stock in the business and that plaintiffs never put down the $500,000 to invest in the company. Moreover, plaintiff Miller's management techniques increased David and Robert Hudson's personal debt and no plaintiff contributed working capital to the dealership. At the same time, plaintiffs have adduced evidence that when the parties first met in March or April 2003 to form "some type of management agreement," they discussed compensating plaintiffs for providing management services to defendant and arranged for plaintiff Miller to start working immediately, with a final deal to be arranged later. Although defendant sought a cash infusion at the time, plaintiffs were not yet offered a chance to invest in the business as shareholders. (Defendant contends that this testimony comes from a declaration by plaintiff Miller that contradicts his former deposition testimony. However, at the deposition, plaintiff Miller testified only that "they said they needed cash infusion" and "[t]here was some generalizations made about the amount of cash," although he could not recall the amounts. Nothing in his declaration statement contradicts this testimony, so it may be considered.)

Viewing the facts in the light most favorable to plaintiff, a reasonable finder of fact could find that initially, defendant negotiated for management services and intended to pay for them. Later, the parties shifted the focus of negotiations to a business investment that would include management services. When the larger deal fell apart, plaintiffs were not compensated for their management services. In these circumstances, it would be inequitable

for defendant to retain the benefit of plaintiffs' services.

Because material issues of fact remain regarding the value of the benefit conferred upon defendant by plaintiffs' services and whether the circumstances make it inequitable for defendant to retain the benefit of plaintiffs' services, I will deny defendant's motion for summary judgment on plaintiffs' unjust enrichment claim.


ORDER

IT IS ORDERED that:

1.  Defendant Middleton Motors, Inc.'s motion for summary judgment is GRANTED with respect to plaintiffs Lindquist Ford, Inc., Steven Lindquist and Craig Miller's claims for breach of contract and promissory estoppel.

2.  Defendant Middleton Motors, Inc.'s motion for summary judgment is DENIED with respect to plaintiffs Lindquist Ford, Inc., Steven Lindquist and Craig Miller's claims for quantum meruit and unjust enrichment.

Entered this 7th day of November, 2007.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

24