IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LINDQUIST FORD, INC.,
STEVEN LINDQUIST, and
CRAIG MILLER,

                Plaintiffs,

      v.

MIDDLETON MOTORS, INC.,

                Defendant.

OPINION AND ORDER

07-cv-12-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     With their Ford dealership, Middleton Motors, Inc., in financial distress, Dave and Bob Hudson saw Craig Miller and Steve Lindquist as the answer to their problems, not realizing how hard it would be to give up control over the dealership and accept plaintiffs' proposed changes.  Starting with the best of intentions, the parties to this suit are now estranged and engaged in protracted litigation.

     Plaintiffs brought this civil case for money damages in 2007, seeking compensation for the services they provided defendant.  They prevailed after a court trial.  On appeal, the Court of Appeals for the Seventh Circuit reversed the finding in plaintiffs' favor, finding that this court had misapplied the common law theories of quantum meruit and unjust

1

enrichment and that another trial was required to allow the court to weigh the equities properly.  Linquist Ford, Inc. v. Middleton Motors, Inc., 557 F.3d 469, 482-83 (7th Cir. 2009).

The second trial was held in August.  After hearing the evidence presented at that trial and the lawyers' arguments, I am persuaded that plaintiffs have shown their entitlement to an award of damages under both common law theories and that they are entitled to an award of damages for the benefit they conferred on defendant.  Although plaintiffs have asked for the time value of the money owed them since 2004 and it seems inequitable to deny them that money, I can find no support in Wisconsin law for such an award.

From the evidence adduced at that trial and the previous one, as well as the stipulations of the parties, I find the following as fact.

FACTS

A. The Parties

Plaintiff Lindquist Ford, Inc. is a Delaware corporation with its principal place of business in Bettendorf, Iowa.  Both Steve Lindquist and Craig Miller are domiciled in Iowa.  Defendant Middleton Motors, Inc. is a Wisconsin corporation with its principal place of business in Middleton, Wisconsin.  Both Lindquist Ford and Middleton Motors are Ford dealerships that sell new and used vehicles.

2

Since 1999, plaintiff Miller has been the general manager of family-owned plaintiff Lindquist Ford since 1999.  As a non-family member and general manager, he was confronted at the outset with management problems, family dissension and the impact of having just opened a new facility.  He dealt with these problems and made Lindquist Ford profitable.

As of March 2003, defendant was a family-owned business that had just opened a new facility and was experiencing management problems.  It was in a poor cash position and in danger of being out of trust.  Defendant was owned equally by three brothers, David Hudson, Robert Hudson and Daniel Hudson, each of whom was a director and employee. Dave Hudson acted as general manager of the dealership, Bob Hudson was president and involved in many outside community and trade group activities.  Dan Hudson was head of defendant's service area.

B. <u>The Parties' Negotiations</u>

Plaintiffs Miller and Steve Lindquist came to know Dave and Bob Hudson through a dealer "20 Group," a regional group of non-competing dealers sponsored by the National Automotive Dealers Association that meets periodically to exchange information and ideas about improving dealership operations and profitability.  Over time, plaintiff Miller learned that defendant had management problems and was experiencing financial difficulties, in part

3

because of its move to a new facility.

Plaintiff Miller visited defendant's facility in 2000 and 2001. During the second visit, Miller met with David Hudson and Joe Schwarz, who served as defendant's accountant and business consultant. The three men discussed defendant's problems and the possibility of plaintiffs' providing help. General discussions continued through the rest of 2002 and early 2003. In March 2003, plaintiffs Miller and Steve Lindquist talked with Dave Hudson specifically about the possibility of providing management help to defendant. The next month, David and Robert Hudson placed Dan Hudson on a leave of absence and subsequently removed him from defendant's board of directors.

Before defendant began talks with plaintiffs, it had looked for help from other dealerships, including the Geiger Group in Elkhorn, Wisconsin. Although Geiger had the potential to invest money in defendant, it did not have the highly skilled manager that defendant needed.

On April 17, 2003, plaintiffs Steve Lindquist and Craig Miller and plaintiff Lindquist Ford's accountant, Carl Woodward, met in Middleton at Joe Schwarz's office with Schwarz, David Hudson and Robert Hudson to discuss a possible agreement between Lindquist Ford and defendant. Miller and Lindquist talked about compensation for management assistance; the group discussed a number of different percentages for such compensation. Woodward suggested an arrangement in which plaintiffs would make an investment of $200,00

4

immediately, with the balance to come as needed.  Defendant made it clear that it wanted a cash infusion into the dealership as part of the arrangement, but, with two exceptions,  the parties reached no agreement about any investment of funds, about the percentages plaintiffs would receive for compensation or anything else at the meeting.  They did agree that plaintiff Miller would come to work at the dealership the following Monday and that Woodward would draft a proposed management agreement.

At the meeting, the parties talked about structuring a management fee giving plaintiff Lindquist Ford 53.25% of defendant's net profit for Miller's management services.  The group did not assign anyone to work on any kind of loan proposal or investment agreement.  At the time, Schwarz knew that the Hudsons did not want to give up any ownership interest in defendant.  Bob Hudson, in particular, was opposed to any change in ownership.

The proposed management agreement that Woodward drafted gave the Management Company, defined as plaintiffs Steve Lindquist and Miller, "full and complete authority in running the day to day operations for dealership."  Trial Exh. #4.  It provided that if the services of the Management Company were terminated by defendant before January 1, 2005, the company would receive the greater of $350,000 or 50% of the profits after "both fees" had been paid.  (Presumably, these fees were the management fee of 15% of profit paid monthly plus 45% of the remaining profit.  The proposed agreement contained no provision for any contribution of cash by plaintiffs.

5

Although Bob and Dave Hudson, as well as Schwarz, had talked about the importance of a cash infusion from plaintiffs, it was not until a July 23, 2003 conference call with Dave and Bob Hudson and Joe Schwarz that plaintiffs ever indicated any willingness to contribute $500,000. At that time, plaintiffs specified that they would make a cash infusion only if they obtained an ownership interest in the form of stock. Before then, plaintiffs had proposed only the possibility of signing personal guarantees on defendant's line of credit. During the July 23 telephone call, Schwarz agreed to draft a letter of understanding. It was late August before he gave a copy to David Hudson and neither he nor Hudson provided a copy to Miller until some time after that.

As drafted by Schwarz, the letter of understanding provided that plaintiffs would provide a cash infusion of $500,000 in return for a 25% ownership interest in defendant. Trial Exh. #7. The letter did not say how, when or under what circumstances the money would be contributed or returned. It provided that plaintiffs Steve Lindquist and Miller would form an LLC to act as the management company and would "have full and complete authority in running the day-to-day operations of the dealership." Id. The management company would share fees consisting of "a 15% fee based on real income to be paid for recovery of expense and time associated with the assistance provided by Lindquist Ford." Id. In addition, 22.667% of the remaining real income would be paid for management of the operations. The fees would begin the first month that defendant reported a real income

6

profit.  "Real income" was to be defined as GAAP income adjusted for LIFO and other items that "cause a tax difference which results in one party receiving a benefit or detriment that should follow the other party."  Id.  According to the proposal, if Dan Hudson were to sell his stock back to defendant, defendant would repurchase the stock as Treasury stock.

The letter of understanding included provisions governing fees to be paid should either the Management Group or defendant decide to terminate for good cause.  In that case, the Management Group would be entitled to an additional 50% termination fee on the range of income between $500,00 and $1,000,000 for the next 24 months; if income rose above $1,000,000 for the next 36 months, the fee would continue to be paid for 36 months.  Miller believed that the "good cause" requirement would protect plaintiffs from the possibility of a premature termination of their management services.  He told Dave Hudson that the letter of understanding was acceptable.

In November 2003, plaintiff Miller learned that Dan Hudson was negotiating to sell his ownership interest in defendant to Pat Baxter, the owner of one of defendant's major competitors in the Madison market.  Dave and Bob Hudson sought to prevent the sale.  Dan filed a lawsuit against defendant and his brothers in state court on November 11, 2003; the case was not closed until December 10, 2004.

Defendant never prepared any formal documents for the sale of stock to plaintiffs, such as stock certificates or a buy-sell agreement identical to the one that existed among the

Hudson brothers.  Defendant never prepared a formal management agreement.  At no time after the letter of understanding was given to plaintiff Miller in September 2003 did any representative of defendant ask him or plaintiff Steve Lindquist for $500,000 in exchange for a 25% ownership interest, although Dave Hudson asked Miller about cash from time to time.  No one suggested any time for a closing of the transaction or sought to obtain any kind of written commitment from plaintiffs for a stock purchase of $500,000.  Neither of the Hudsons or Schwarz made any attempt to obtain a writing executed by the parties providing that plaintiffs would purchase stock in defendant for $500,000.

Defendant terminated its relationship with plaintiffs on March 22, 2003, before the parties reached any final agreement on the terms of any management agreement.  Defendant did not find another source of cash until 2006, when plaintiff Miller's replacement, Michael Bihun, made an investment in the company.

### C.  Services Provided by Plaintiffs

Plaintiff Miller performed all the duties of a general manager on a daily basis, whether he was at defendant's facility or in Bettendorf.  He often drove to Madison on early Monday morning to begin work, stayed stayed overnight and worked a full day on Tuesday.  He made at least 30 two-day trips and at least 10 one-day trips.  If he was not at defendant's facility, he held daily telephone conferences with each of defendant's department managers to review

8

department goals, scheduled appointments and other details and held a daily cash management meeting at which he made decisions about necessary borrowing, inventory purchases and debt repayment.

Miller implemented a management strategy aimed at increasing sales, eliminating unnecessary expenses and cutting losses. He emphasized competitive pricing and increased selection and concentrated defendant's advertising on these two factors. He changed advertising agencies, increased the amount of advertising and advertised heavily year-round, rather than just in the warmer months. The inevitable result of an inventory increase was to increase the dealership's debt, which was guaranteed personally by Dave and Bob Hudson, and to decrease liquidity. However, defendant was never out of trust or in default on any loan agreement under plaintiff Miller's management and Ford Motor Company never stopped lending to defendant. Although some of its customer service comments were less favorable than they had been before Miller started, the dealership never lost its Blue Oval certification, which was based on meeting certain Ford standards, and Miller was working to replace the former services manager.

Plaintiff Miller identified and cut what he considered to be unnecessary expenses at defendant. He either recommended, implemented or planned to implement the following cuts:

• eliminating defendant's fleet of loaner and rental vehicles and arranging with

Enterprise car rental to provide loaner vehicles as needed;

- eliminating expensive customized vehicles, such as the Saleen, that had high finance fees;

- collecting on past due warranty claims on the Saleen cars;

- terminating Joe Schwarz as defendant's accountant and substituting a less expensive accounting service and using plaintiff Lindquist Ford's accountant;

- negotiating substantially lower credit card processing fees;

- negotiating new floor financing terms with Ford Motor Credit Company to lock interest rates at .50 % below prime in place of defendant's then current rate of prime plus 1.0 percent;

- negotiating a new garage insurance contract, for annual savings of $10,000 to $15,000;

- beginning efforts to negotiate a new health insurance contract, for annual savings of $20,000;

- structuring pay plans to be gross and profit focused;

- eliminating high bonus plans for employees while defendant was losing money;

- creating a new service contract deal;

- identifying miscellaneous expense items that could be provided at a lower cost, such as coffee, cookies, landscaping and aquarium cleaning;

- setting up a payroll account with Wells Fargo to save on payroll processing charges;

- implementing shop charges on service and repairs to offset costs of lubricants and grease; and

- consolidating certain positions and reducing the number of part-time employees.

Plaintiff Miller identified goals for each department, giving each manager an opportunity to take responsibility for the success of the department.  He began weekly manager meetings to discuss problems and sales goals and met with the regional staff for the Ford Motor Credit Company and with a local bank to assure them that the dealership would return to profitability.  The Hudsons delegated to Miller the difficult tasks of informing Dan Hudson that he would not be returning to work for defendant and firing defendant's general sales manager.

Besides plaintiff Miller's services, plaintiff Lindquist Ford's controller, Kathleen Gerety-Nesseler, provided assistance to defendant both in Middleton and from Bettendorf. She helped train defendant's office staff and bookkeepers and gave them assistance with various tasks.  Steve Lindquist made several trips to Madison and assisted plaintiff Miller in developing defendant's advertising campaign.

In June 2003, soon after plaintiff Miller had started as general manager, he hired an employee of plaintiff Lindquist Ford, Michael Bihun, to become defendant's general sales manager.  Miller had worked closely with Bihun at Lindquist Ford and believed Bihun shared his management philosophy.  After defendant terminated its relationship with plaintiffs, it promoted Bihun to general manager.

Before defendant terminated plaintiff Miller as general manager, Miller had

11

contracted for a new computer program system to be installed on plaintiff Lindquist Ford's hardware and accessed by way of a fiber optic T-1 data line computer link between the two dealerships. David Hudson agreed that defendant would pay for the cost of the data line, but it has never done so.  After terminating its relationship with plaintiffs, defendant contracted for the ADP system, despite the fact that it had a contract for another system.  Dave Hudson recognizes that the ADP system provides features that defendant's old system did not and that it would have been more expensive to add the features than to install the ADP system.

### D. Defendant's Financial Statements

Defendant's gross sales for 2002-2006 were:

        2002: $23,873,622
        2003: $30,877,591
        2004: $37,004,291
        2005: $33,604,225
        2006: $30,338,999

Defendant's profits and losses for 2000-2006 were:

        2000:  $10,515
        2001:  $ 7,480
        2002:  ($387,365)
        2003:  ($275,600)
        2004:  ($42,098)
        2005:  ($296,584)
        2006:  ($68,002)

Defendant's expense to gross sales ratios for the years 2001-2006 were:

        200l:  13.82%
        2002:  16.72%
        2003:  14.43%
        2004:  13.20%
        2005:  15.30%
        2006:  15.80%

In the first three months of 2003, before plaintiff Miller became general manager, defendant's dealer financial statements showed losses of $165,030; in the first three months of 2004, they showed losses of $29,477.  Although the profits for 2003 were a negative amount ($275,600), the dealership showed a profit for the last half of the year, when real income was computed as contemplated in the letter of understanding drafted by Schwarz on behalf of defendant.  Defendant suggested that real income be defined as income adjusted for accounting decisions such as LIFO, "which as they occur cause a tax difference which results in one party receiving a benefit or detriment that should follow the other party." Trial Exh. #9.  (LIFO is an accounting method for managing inventory; it stands for last-in, first-out and allows the most recently sold items to be recorded as sold first, which can be advantageous in reducing income taxes in times of inflation.  Scott Gibson, The RMA Journal, at 1 (Oct. 2002)  http://findarticles.com/p/articles/mi_mOIW/is/2.)

Before plaintiff Miller took over, defendant was the poorest performing Ford dealership in the Madison market.  After he became involved, defendant's sales volume was

increasing and the volume at Kayser Ford was declining.  By 2007, defendant was selling more cars than any other dealership in the Madison market.

Using the general idea of the adjustments contemplated by the parties in their letter of understanding (defining real income as GAAP income (income calculated according to Generally Accepted Accounting Principles), adjusted for LIFO and other items and deducting items that were included for the Hudsons' benefit), defendant became profitable by June 2003 and continued to be profitable through March 2004.

### E. Defendant's Expenses and Payments for Plaintiffs' Services

Defendant provided plaintiff Miller a Ford F-150 pickup truck for his use, paid for the insurance and maintenance on the truck and reimbursed plaintiff Lindquist Ford for certain gasoline charges and parts for the vehicle.  It also reimbursed plaintiff Lindquist Ford for certain food, lodging and travel expenses for plaintiff's work with defendant.

During the course of its relationship with defendant, plaintiff Lindquist Ford sent invoices to defendant for a variety of expenses, including bulk purchases, vehicle purchases, transportation for vehicle exchanges between the dealerships, lodging, meals and out-of-pocket travel expenses that plaintiff incurred on behalf of defendant.  Defendant paid the invoices within 30 days, thus receiving 30 days of free financing on the vehicles and other items for which it reimbursed plaintiff Lindquist Ford.

14

In December 2003, defendant paid plaintiff Miller $7,668.00 as a partial advance of the estimated management fee plaintiffs expected to receive for 2003 as a percentage of profits earned by defendant.  Miller asked for this money to pay his estimated income tax on the management fee.  Defendant is entitled to a credit of this amount against any amounts otherwise owed to plaintiffs.  David Hudson approved the payment and recorded it as a loan in an account ledger.

With the exception of the dispute involving the cost of the installation of the T-1 data computer link, for which plaintiffs seek reimbursement from defendant in the amount of $6,244.19, defendant has reimbursed plaintiff Lindquist Ford for all expenses that plaintiffs incurred on defendant's behalf.

## F. Termination of Plaintiffs

Dave Hudson terminated plaintiffs in March 2004.  In a letter sent to defendant on May 11, 2004, plaintiff Miller demanded $32,627.84 in payment for the 2003 calendar year, 50% of the adjusted profits for 24 months or the year ending December 31, 2005, and an additional 50% of profits for the 2006 year as compensation for "converting" plaintiffs' "trained and talented manager" to defendant's use.  Trial Exh. #37.

15

G. Pay Rates for General Managers

Plaintiff Miller's annual income as general manager at plaintiff Lindquist Ford varied

between 2003 and 2004 as shown below:

        2003: $221,533.86
        2004: $202,414.14
        2005: $210,291.36
        2006: $162,379.62

For 2004, the salary of Michael Bihun (the former Lindquist employee who replaced

plaintiff Miller as defendant's general manager) was $146,000.  It went down to $143,000

in 2005 and up again in 2006 to $145,000 and was projected to be $200,000 in 2007.

In David Hudson's opinion, reasonable compensation for a general manager of a

dealership like plaintiff Lindquist Ford with plaintiff Miller's experience would be $300,000.

Defendant's expert, James Neustadt, testified that in his opinion, a person with the title of

general manager, exercising the duties of a general manager, running one dealership in the

Madison area, selling approximately 600 or more new vehicles, would earn $150,000 a year.

The average compensation, not including benefits, of general managers in the region

including Wisconsin was $156,927 in 2002 and $160,603 in 2004.

Taking the average salary of general managers in the Wisconsin region as $158,765

in 2003, the reasonable compensation for a general manager at defendant's facility for eight

months would have been $105,843.33.  Reasonable compensation for three months in 2004

16

would have been $40,150.75, for a total of $145,994.08.  A manager with plaintiff Miller's skills and experience would have expected to be paid more than the average.  Many dealerships pay half of their managers' manager's health insurance premiums for a cost of $6,000 to $7,000 a year and profit sharing of up to 2% of their managers' compensation. Such benefits would raise the total due plaintiffs to $155,101.46 for plaintiff Miller's work.

It is usual for a company that employs a general manager to manage more than one dealership to maintain the manager's base salary but give him or her the same share of profits at each of the dealerships.  Obviously, an unprofitable dealership cannot do that.  It would have to guarantee the salary of its general manager rather than grant pay as a percentage of profits, at least until the new manager has had a chance to improve the dealership's financial situation.

Although plaintiff Miller performed some of his work for defendant from his office in Bettendorf, he performed all of the duties of a general manager during the 11 months of the parties' arrangement.

## H. Time Value of Money

The money due plaintiffs is calculated in 2003 and 2004 dollars.  Defendant has had the use of that money for 64 months.  During that time, the rate it paid to borrow money was prime minus .50 %.  The prime interest rate from 2004 until December 16, 2008 was

4%; on December 16, it dropped to 3.25% and remained there until August 2009.  Applying these rates to $154,007.00 produces a time value of money of $26,534.12.


## OPINION

It is possible, but not likely, that the outcome of the parties' effort to revitalize defendant could have been different.  It was bound to be a fraught proposition.  Plaintiffs were not coming into the dealership to pat the Hudsons on their backs for a job well done; they were coming in to upset every assumption on which the dealership had been operating.

It may be that the parties would have avoided litigation if they had formalized their discussions on compensation and made it plain whether the agreement hinged on plaintiffs' contribution of cash and if so, how and when that contribution was to be made, but they never did this.  With no contractual ground for obtaining compensation for the services they provided, plaintiffs can recover only if they can show they are entitled to relief under either or both of the quasi-contractual theories of quantum meruit and unjust enrichment.


### A. Quasi-contractual Theories of Relief

1. Unjust enrichment

As the court of appeals explained in its opinion in this case, the theories of unjust enrichment and quantum meruit have slightly different elements.  Proving a claim of unjust

18

enrichment requires proof of three elements:  "'a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of the fact of such benefit, and (3) acceptance and retention by the defendant of the benefit, under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof.'"  Lindquist Ford, Inc. v. Middleton Motors, Inc., 557 F.3d 469 (7th Cir. 2009) (quoting Seegers v. Sprague, 70 Wis. 2d 997, 1004, 236 N.W.2d 227, 230 (1975)).  Take the example of a contractor who puts in a new driveway for the wrong homeowner and wants to recover from the homeowner for the alleged benefit received.  If the contractor wants to recover under the theory of unjust enrichment, he would have to prove not only that he conferred a benefit on the homeowner, but that the homeowner appreciated the benefit.  The extent to which he did might depend on whether the old driveway was in need of repair or replacement.  In addition, the contractor would have to prove that it would be inequitable for the homeowner to retain the benefit without payment.

In this case, the court of appeals agreed with the determination after the first trial that plaintiffs' efforts to help defendant with its management problems conferred a benefit upon defendant and that defendant accepted the benefit.  Id. at 482.  However. the court of appeals was not convinced that this court analyzed the factors making up the third element, whether it would be equitable for defendant to accept the benefit without payment.  As the court of appeals saw the issue, it was more than simply whether it would be fair to withheld

payment from an employee who had worked for 11 months.  Instead, a proper analysis required consideration of the parties' negotiations, their understanding about the terms under which plaintiff Miller would be working for defendant and the effect of plaintiffs' failure to come forward with a cash infusion in return for partial ownership of defendant.

The parties' additional evidence of their negotiations and understandings has made it clear that equity lies with plaintiffs.  Although the court of appeals was concerned about the lack of a cash infusion, the evidence shows that defendant's primary goal was to secure management assistance.  The dealership was losing money; the owners wanted to make the company profitable again, but were not sure how to make that happen.  Dan Hudson had been put on leave; Bob Hudson wanted to spend most of his time on community and trade group activities; and Dave Hudson realized that the dealership needed more management than he could provide.  Defendant wanted additional cash, but, as its overtures to the Geiger Group demonstrated, this need was secondary to its need for management skills.

Plaintiff Miller wanted to help his friend Dave Hudson, but his goals were not entirely altruistic; at the same time, he and Steve Lindquist saw an opportunity for marketing Miller's skills while they rescued defendant.  Thus, as the court of appeals suspected, negotiations with defendant proceeded on the basis that their Management Company would earn no fees until and unless the dealership was showing a profit. That does not mean, however, that plaintiffs are not entitled to compensation for the work they did for

20

defendant.

First, as shown by Woodward's June 2, 2003 proposal, plaintiffs expected to be compensated if defendant terminated their services before January 1, 2005, by which time they believed they would have had a fair opportunity to turn the dealership around. In the event of a termination before then, plaintiffs wanted defendant to pay them the greater of $350,000 or 50% of the profits after paying them their fees. Although the parties never reached agreement on the amount of money plaintiffs would be owed if their services were terminated prematurely, plaintiffs thought they were protected by the terms of the letter of understanding that Schwarz gave to Dave Hudson in late August 2003. They understood the letter's provision for termination only on a showing of good cause as a guarantee that they could not be terminated for anything short of good cause. Although this letter was never a formal agreement, it is part of the parties' "negotiations and understandings" about the terms of Miller's employment. Lindquist, 557 F.3d at 482.

Defendant denies that plaintiffs' services were terminated prematurely and that plaintiffs were denied sufficient time to achieve the results they anticipated. It alleges that plaintiff Miller told the Hudsons and Schwarz that he would turn the business around by December 2003. If he did say this, which he denies, there is no evidence that he meant it to be anything more than the kind of thing a football coach says before a game to fire up enthusiasm.

21

The evidence shows that defendant terminated plaintiff Miller just as many of his cost-cutting, sales-boosting strategies were beginning to show results. Miller had cut out many unnecessary costs, pruned the interest rates the dealership was paying for floor inventory, eliminated the expensive, slow-selling Saleen line and cut the costs of managing payroll. He was scrutinizing every expense, including some personal expenses of the owners that were run through the dealership account. He was increasing the number of cars on the lot, taking advantage of the low interest rates in effect at the time, re-focusing advertising on price and selection and working to sell cars all year and not just in the warmer months. He had fired unproductive employees and was installing a new computer system that would enable defendant to keep better track of its inventory, expenses and other matters. These and other changes helped the dealership produce "real income" in 2003, that is, income adjusted to GAAP principles.

This premature firing was not equitable. Plaintiffs had devoted 11 months of effort to the dealership with the reasonable expectation that they would benefit from doing so, only to find themselves ejected unceremoniously from the dealership, which retained the benefits of their hard work and assistance. As the court of appeals noted, it is one thing to take a gamble on a contingency, as a lawyer does when accepting a case on a contingency fee basis; it is another to be frustrated before having a fair opportunity to win the bet. Id. at 480. So it is with plaintiffs. They took a chance that they could help their friends and make some

22

money for themselves.  They provided the help but were prevented from achieving any payoff.

Defendant's early termination of plaintiffs frustrated their ability to earn a fair fee for their work.  So, too, did Dave Hudson's refusal to allow plaintiffs full control of the management of the dealership.  If there was one thing on which the parties came to full agreement, it was that plaintiffs would have free rein to put their management policies into effect.  Yet, on repeated occasions, Dave Hudson found himself unable to accept plaintiff Miller's management decisions.  When his unwillingness to give plaintiffs the control for which they had bargained grew too strong, he terminated them.

The court of appeals suggested that plaintiffs' failure to come forward with a $500,000 cash infusion might bear on the parties' understandings about the terms under which plaintiff Miller would work for defendant, Lindquist Ford, 557 F.3d at 482.  In fact, the evidence is that it was defendant that dropped the ball in this regard.  In the first negotiations, plaintiffs were unwilling to provide any cash at all and never told defendant that they would, although Woodward suggested the possibility of doing so.  Nevertheless, defendant asked plaintiff Miller to begin working at the dealership on April 21, 2003, only four days after the parties' first meeting.  Nothing more was said about a cash infusion until the July 23, 2003 meeting at which plaintiffs said they would be willing to put in $500,000, but only in return for an ownership interest in the form of stock.  In the letter of

23

understanding that Schwarz prepared after the July 23 meeting, he provided that plaintiffs would invest $500,000 in return for stock, but did not specify how or when this would be done.  Plaintiff Miller finally saw the letter of understanding on September 10, 2003, after he had been working almost five months.  No representative of defendant ever asked him or plaintiff Steve Lindquist for a written commitment to make the investment.  Dave Hudson testified that he asked Miller about the money from time to time but he never said that he made any formal demand or identified possible terms.  No one ever suggested any time for a closing; no one drafted a buy-sell agreement; no one drafted any other documents for the sale of stock.  At the same time, defendant benefited from plaintiffs' services.  Under these circumstances, it would not be equitable to use plaintiffs' failure to invest in the dealership as a reason to excuse defendant from compensating plaintiffs.  I conclude, therefore, that plaintiffs are entitled to damages under their theory of unjust enrichment.

2.  Quantum meruit

Under Wisconsin law, quantum meruit has two elements:  the plaintiff must prove that the defendant requested the plaintiff's services and it was reasonable for the plaintiff to expect compensation for the services.  Lindquist Ford, 557 F.3d at 477-78.  The second element takes equitable concerns into consideration:  "if equity does not lie on the plaintiff's side under the circumstances, his expectation of compensation is necessarily unreasonable."

24

Id. at 478.  The court of appeals noted that it is not always easy to determine whether the plaintiff expected to be paid, particularly in sophisticated commercial settings, id. at 479. As noted above, the court used as an example a lawyer who takes a case on a contingency basis.  Ordinarily, in that setting, the lawyer is entitled to a fee if she wins, but if she loses, she is entitled to nothing, no matter how hard she worked.  The court hypothesized a situation in which the client accepted the idea of a contingency fee but was unable to reach an agreement with the lawyer on the exact figure before the case went to trial.  In that situation, the court said, the outcome is the same, with or without an agreement.  The lawyer is out of luck.  "In the language of quantum meruit, the lawyer reasonably expected compensation, *but only if he won the case;* he did not expect compensation—or his expectation of compensation was unreasonable—if he lost."  Id. at 479-80.  The court recognized an exception to this rule if the client were to frustrate the lawyer's ability to win the case or fire him on the eve of trial.

The court of appeals emphasized that "the parties' failed negotiations are relevant under quantum meruit—and, of course, under unjust enrichment, whose elements expressly include equity—because they can show, perhaps decisively, what the plaintiff expected when he rendered services."  Id. at 480.  As I have found, plaintiffs expected to be compensated for the services they provided defendant, either by a fee representing a portion of the profits earned by the dealership or, if the arrangement was terminated before they had a fair

25

opportunity to earn profits, by a set sum of money.  That expectation was a reasonable one.

## C. Damages

Valuing the benefit that plaintiffs conferred on defendant varies slightly, depending on which theory of equitable relief applies.  Under unjust enrichment, the question is what the service was worth to defendant.  Lindquist Ford, 557 F.3d at 477 ("The measure of damages under unjust enrichment is limited to the value of the benefit conferred on the defendant; any costs the plaintiff may have incurred are generally irrelevant.") (citing Management Computer Services, Inc. v. Hawkins, 206 Wis. 2d 158, 557 N.W.2d 67, 79-80 (1996)).  Under quantum meruit, the question is what defendant would have had to pay in the marketplace to obtain the service.  Id. ("Under quantum meruit, damages are 'measured by the reasonable value of the plaintiff's services,' Ramsey [v. Ellis], 168 Wis. 2d 779, 484 N.W.2d 331, 334 (1992), and calculated at 'the customary rate of pay for such work in the community at the time the work was performed.'  Mead v. Ringling, 266 Wis. 523, 64 N.W.2d 222, 225 (1954)").  As I explain below, in this case, these two analyses and one and the same.  What a general manager's services are worth to a dealership is what they would cost in the marketplace, barring deleterious management, which is not what plaintiffs provided.

Defendant argues that plaintiffs conferred no benefit on it and is entitled to no

26

damages.  Alternatively, it argues that if plaintiffs are entitled to any damages, they are limited to what plaintiff Miller demanded in a letter sent to defendant on May 11, 2004, because that letter is the best expression of what plaintiffs expected in the way of damages. Moreover, Miller's demand of $32,627.84 should be reduced because that amount was based on a percentage of defendant's adjusted profit, including a percentage of profits related to the ownership interest that plaintiffs never acquired.  Defendant suggests the figure of $23,079.68.  It says that no percentage of profits going forward is owing both because defendant never made any profit in the rest of 2004 or in the three succeeding years and, even if it had positive "real income" in any of those years, plaintiffs have produced no expert to identify such income.

I do not read the May 11 letter as limiting what plaintiffs may ask for in the way of damages or as the binding expression of plaintiffs' expectations.  Miller is only one of three plaintiffs; what he thought in May 2004 is not necessarily what the other plaintiffs thought. As to the arguments about percentages of profits, they are irrelevant in deciding what amount of money plaintiffs are entitled to for the benefit they conferred on defendant.

1. Benefit under unjust enrichment theory

As set out in the facts, plaintiffs conferred a significant benefit upon defendant. Plaintiff Miller increased sales and cut costs significantly.  The last six months of 2003 were

27

profitable for the dealership, after losses the year before.  Plaintiff Miller had made lasting improvements that provided a foundation for future growth, including hiring Michael Bihun as a sales manager.

Defendant tries to counter this evidence by citing Dave Hudson's concerns about plaintiff Miller's management:  less liquidity, the increase in borrowing by the dealership, which put his and his brother's funds at risk, delays in preparing tax returns, poor oversight of paperwork, the loss of employees and a drop in employee morale.  The delays in the tax return preparation were a legitimate problem, as were some of Dave Hudson's fears about paperwork not being done promptly or correctly.  That some of plaintiffs' changes made the Hudsons apprehensive does not mean that plaintiffs did not confer a measurable benefit upon the dealership.  For 11 months it had the services of a successful and skilled general manager, who instituted new procedures, cut costs, increased sales and made the dealership profitable, even if he had not made all the changes necessary to deal with paperwork and timely tax preparation.

How much was this benefit worth?  The most straightforward way to value it is to look at what defendant would have had to pay for a general manager had plaintiff Miller not been willing to take the job.  The court of appeals suggested that in answering that question, this court should look at what general managers are paid in dealerships that lose money, as well as what general managers are paid if they work for more than one dealership.

28

The evidence on that point was that the average pay, not including benefits, for general managers of dealerships in the region including Wisconsin was $156,927 in 2002 and $160,603 in 2004.  At the average rate of pay, plaintiff Miller would have earned $145,994.08 for his 11 months.  This would have been a guaranteed salary, because the dealership was losing money.  Until it turned around, it could not attract an experienced general manager by offering a percentage of profits as a portion of compensation.  Benefits (half of his health insurance premiums and a contribution of 2% of salary to a retirement plan) would have been $9,107.38, making plaintiff Miller's total compensation $155, 101.46.  This amount makes no provision for any services rendered by plaintiff Lindquist's bookkeeper or by plaintiff Steve Lindquist.

2. Benefit to defendant under theory of quantum meruit

Under the theory of quantum meruit, the benefit to the defendant is valued at the customary rate of pay for similar work in the community at the time the work was performed.  As explained above, a conservative estimate of what that amount would have been in 2003 and 2004 is $155,101.46.

3. Time value of money owed to plaintiffs

After the first trial, plaintiffs asked for prejudgment interest on the damages award.

29

I denied this request, finding that plaintiffs had not shown that the amount of damages was either liquidated prior to judicial determination or readily ascertainable because there is a reasonably certain standard of measurement. First Wisconsin Trust Co. v. L. Wiemann Co., 93 Wis. 2d 258, 276, 286 N.W.2d 360 (1980).

Now plaintiffs are asking for an award that recognizes the time value of the money that they are owed. They argue that this request is different from their earlier request for prejudgment interest because they are asking for specific damages incurred by not having the benefit of the money they were owed for more than 64 months. Defendant disagrees, maintaining that this claim is nothing more than a claim for prejudgment interest that Wisconsin law does not recognize and that the earlier ruling is the law of the case.

Defendant's second argument can be disposed of quickly. Although I did rule in February 2008 that plaintiffs were not entitled to prejudgment interest, the court of appeals never ruled on that matter. This leaves me free to change the ruling, if I am persuaded that it is no longer correct.

Defendant's first argument is more persuasive. None of my research indicates that the Wisconsin courts recognize a claim for the time value of a monetary award of damages, except in four situations: the claim was liquidated before trial; the amount of the claim was reasonably determinable before trial and demand was made on the defendant; the prevailing party recovers a judgment greater than or equal to the amount specified in the party's offer

30

of settlement; or the parties agreed by contract to such an award.  Plaintiffs concede that their claim was not liquidated before trial and that they did not offer to settle the dispute for an amount less than they reasonably expect to be awarded.  They do, however, argue that defendant should be required to compensate them for the lost value of their money, because defendant could easily have determined the cost of the services of a general manager for 11 months, using the same figures that plaintiffs presented at trial.  They rely on <u>Laycock v. Parker</u>, 103 Wis. 161, 181-83, 79 N.W.2d 327, 333-34 (1899), in which the Wisconsin Supreme Court held that the owner of a building was obligated to pay the plaintiff contractors for their work on his building and was obligated to pay prejudgment interest on the claim as well  In reaching this latter decision, the supreme court found that the plaintiffs had made a demand upon the owner for work done, that the amount was readily ascertainable from the market place and that the owner had made no complaint about any of the work but had occupied the building from the time it was finished.

Plaintiffs' argument has some surface appeal but it is not ultimately persuasive. Calculating the value of building materials that have been the subject of bills is not the same as calculating the value of a general manager's time when no provision has been made for paying the manager on any given basis.  As for the necessary demand, plaintiff Miller wrote to defendant on May 11, 2004, to demand the sum of $32,627.84.  He did not ask for the $155,101.46 plaintiffs are seeking now.

31

I agree with plaintiffs that it is inequitable not to recognize the loss of value of the money plaintiffs are owed, but I cannot find any Wisconsin law or statute that would permit such an award in this case. As I have explained, Laycock does not support an award in the circumstances of this case. Neither do the other cases plaintiffs have cited. In Johnson v. Pearson Agri-Systems, Inc., 119 Wis. 2d 766, 350 N.W.2d 127 (1984), the Supreme Court of Wisconsin considered the request of an injured plaintiff for prejudgment interest on the amount of the judgment, accruing from the date of his accident through the date of entry of judgment. The court upheld the trial court's denial of the plaintiff's request, reasoning that the jury acted properly in discounting the value of his award for future damages because plaintiff had the immediate use of his money and that the jury probably compensated him for his past pain and suffering by awarding him damages calculated according to the current value of the dollar. Id. at 779, 350 N.W.2d at 134. The court suggested that any loss that has a value that is determinable could be the subject of prejudgment interest, but declined to single out this loss for such an award, "where such claim is coupled with non-liquidable claims." Id. at 781, 350 N.W.2d at 135. In part, the court was concerned that doing so would run counter to the purpose of Wis. Stat. § 807.01(4), the settlement offer statute. In addition, it expressed the belief that the question of prejudgment interest should be left to the legislature. Three of the seven justices dissented, with two arguing that the majority's decision not to award interest for past losses was inequitable and contrary to the current

32

trend in that direction.

The dissenters in <u>Johnson</u> cited the court's earlier decision in <u>Nelson v. Travelers Ins. Co.</u>, 102 Wis. 2d 159, 306 N.W.2d 71 (1981), a case in which the court had stated that "[t]he interest obligation imposed upon the wrongdoer is not an additional penalty for the wrong but is simply the value of the use of the money [—]a value which should be accruing for the benefit of the plaintiff-creditor but, because of the nature of the debt, was accruing to the defendant-debtor instead. <u>Id.</u> at 169, 306 N.W.2d at 76. Helpful as this statement might seem to plaintiffs, it is dictum only. The court rested its decision to award interest on damages on the facts that the damages had become determinable when the jury awarded them in the first trial, the appeal was of the liability finding only and the interest award was limited to the time period starting with the entry of judgment on the first verdict. <u>Id.</u> at 170, 306 N.W.2d at 76-77.

In <u>Anderson v. LIRC</u>, 111 Wis. 2d 245, 330 N.W.2d 594, 601 (1983), the state supreme court allowed prejudgment interest against an employer on an award for back pay. As with <u>Laycock</u>, the value of the item in dispute was readily ascertainable before litigation began, bringing the case within one of the exceptions to the general Wisconsin rule that prejudgment interest is not available. In the absence of any Wisconsin law to the contrary, I conclude that plaintiffs are not entitled to interest on the damages award in this case.

4. Total damages due plaintiffs

Plaintiffs are due damages in the amount of $155,101.46 for the value of plaintiff Miller's services, plus the $6,523.53 cost of installing the T1 line to defendant's offices and less the $7,668.00 paid to Miller by defendant in December 2003 as an advance on his management fee for a total of $153,936.99.


ORDER

IT IS ORDERED that plaintiffs Lindquist Ford, Inc., Steven Lindquist and Craig Miller are awarded damages in the amount of $153,936.99.  The clerk of court is directed to enter judgment for plaintiffs and close this case.

Entered this 23d day of October, 2009.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge